NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 30, 2020
Decided January 19, 2021

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-3544

| | |
|---|---|
| ADAM RECHA, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Western District of Wisconsin. |
| *v.* | |
| | No. 3:19-cv-00317 |
| ANDREW M. SAUL, Commissioner of Social Security, | |
|     *Defendant-Appellee*. | James D. Peterson, *Chief Judge*. |

**O R D E R**

Adam Recha suffered a serious head injury during a car crash in November 2014. In the months that followed, he noticed an increase in the auditory hallucinations that he had first started experiencing in high school. Recha sought treatment and, at age 24, was diagnosed with schizophrenia. He is now 30 and seeks to reverse a decision of the Social Security Administration denying him disability benefits. While sympathetic with Recha's condition, we conclude he has failed to show that the ALJ's decision lacked the support of substantial evidence. We therefore affirm the denial of benefits.

**I**

A

Adam Recha was 24 on November 24, 2014 when he crashed his car on an icy road in Wisconsin. The seatbelt he was wearing broke, and Recha hit his head on the windshield. He was transported to St. Joseph's Hospital where a CT scan proved unremarkable.

While hospitalized Recha saw a neurologist, Dr. Sarah Kortenkamp, who evaluated his cognitive ability. Dr. Kortenkamp noted some deficits, recommended that Recha refrain from working or driving, and instructed him to follow up with her in a few weeks. During the follow-up exam, Recha told Dr. Kortenkamp that he was experiencing some confusion and memory loss and could not recall the two years prior to the accident. Dr. Kortenkamp's examination, however, revealed that Recha was "able to answer interview questions by referring to what his fianc[é] had recently told him about what occurred during the past two years." It was during this exam that Recha first reported having auditory illusions (hearing screaming voices) and seeing "shadows and figures" that he knew were not real. Recha would later recount that he first started experiencing these hallucinations in high school.

A short time later, on January 23, 2015, Recha sought hospital admission because he was hearing voices telling him to kill himself and his cats. During his three-day stay, Recha was diagnosed with "Schizophrenia, not otherwise specified," a cognitive disorder due to head injury, and "Cluster A personality traits." After his discharge, Recha sought treatment from Randall Ahrens, a Licensed Clinical Psychologist, and Dr. Carol Barber, a psychiatrist.

Since approximately February 2015, Recha has seen Ahrens every two weeks and Dr. Barber monthly. He has consistently reported auditory and occasionally visual hallucinations that have waxed and waned primarily in conjunction with his stress level. Dr. Barber has frequently adjusted Recha's medications based on his reported symptoms. Relevant to this appeal, in nearly every treatment record submitted as part of Recha's application for disability benefits, Ahrens or Dr. Barber noted that Recha's concentration was "clinically intact," he was "able to participate in [the] interview with no more than average distractibility," and his memory remained "clinically intact" with "no obvious short or long term memory deficits."

B

On January 27, 2015, two days after being discharged from the hospital, Recha filed for disability benefits, alleging an onset date of September 28, 2014. After the agency denied the application, a hearing ensued before an ALJ in November 2017.

Recha testified at the hearing regarding his symptoms, prior work history, and daily activities. He stated that, despite taking medications and receiving other treatment, he continued to hear voices several times a day. He added that he had difficulty sleeping, was uncomfortable in crowds of more than ten people, had trouble with his short-term memory, and struggled with authority figures. In response to questions about his daily activities, Recha testified that he helped with household chores, went to the grocery store a couple times a month, used the internet, and socialized with a few good friends and his girlfriend.

The ALJ also questioned a vocational expert and posed two hypothetical questions with varying restrictions to the VE. He first asked her the following:

> [A]ssume we have an individual who doesn't have any significant exertional or other physical limitations; the individual could perform simple, routine, repetitive tasks; work that involves only brief, superficial contact with supervisors or the public; and the individual is able to tolerate simple changes in routine, avoid hazards, travel independently, and make or carry out simple plans.

The VE testified that someone with these limitations could perform Recha's previous work as a "laborer of stores." She further testified that someone with these limitations and Recha's "vocational profile relative to age, education, and work history" could work as a housekeeper, cleaner, and stock clerk.

The ALJ then asked the VE this second question:

> [A]ssume it's found that in addition to the restrictions we considered in our first hypothetical that due to the effects of concentration difficulties, occasional auditory hallucinations would cause the individual to be off task [and] unproductive 25 percent or more of the workday, how would that [a]ffect the ability to do the jobs previously cited?

This time the VE answered that there would be no competitive full-time employment positions available.

After the hearing, the ALJ requested another psychological evaluation of Recha, which was performed by Dr. Brenda Reed. Upon reviewing Dr. Reed's report, the ALJ issued his decision and concluded that Recha was not disabled. As part of applying the requisite five-step process, the ALJ crafted a residual functional capacity, or RFC, for Recha which attempted to capture the limitations on his daily work abilities. He found that Recha "can perform simple, routine, repetitive tasks; work that involves only brief superficial contact with supervisors or the public; and is able to tolerate simple changes in routine, avoid hazards, travel independently and make and carry out simple plans."

The ALJ also relied on the medical opinions of two agency psychiatrists, Dr. Lisa Fitzpatrick and Dr. Reed. Both doctors not only found that Recha had mild to moderate limitations in concentration, persistence, and pace, but also recommended only the types of restrictions the ALJ ultimately included in the RFC determination. The ALJ gave little weight to a short letter submitted by Recha's psychologist, Randall Ahrens, offering the opinion that "Mr. Recha's condition [has] a considerable and negative effect on his ability to be gainfully employed. More specifically, I see Mr. Recha's condition [as] preventing, or at the very least making it extremely difficult, for him to obtain and retain any employment position." The ALJ saw the letter as unsupported by the medical record, and, in any event, opining on an issue reserved to the agency.

Recha appealed to the district court, arguing that the ALJ erred in crafting the RFC. He contended that the ALJ did not sufficiently account for his moderate limitations in concentration, persistence, and pace. The district court affirmed the ALJ's determinations. Recha now appeals to our court.

## II

At the heart of this appeal is whether the ALJ adequately accounted for limitations in Recha's concentration, persistence, and pace, often shorthanded as CPP. As its name implies, CPP "refers to the abilities to focus attention on work activities and to stay on-task at a sustained rate." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00E(3). An ALJ's RFC findings are intended to capture "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1); see also *Moon v. Colvin*, 763 F.3d 718, 720 (7th Cir. 2014), as amended on denial of reh'g (Oct. 24, 2014) ("Residual functional capacity is the extent to which a person can still work despite having health problems."). Recha asserts that the ALJ's RFC determination did not sufficiently

identify the difficulties he has related to the ability to concentrate over an entire workday.

Our review of the ALJ's decision is deferential. We will reverse only upon a showing that the ALJ committed a legal error or rested its determination on less than substantial evidence. See *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). The substantial evidence requirement does not present a high hurdle: the ALJ's decision need only identify "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The ALJ's determination here meets this benchmark.

Our case law makes clear that boilerplate "limitations of concentration, persistence, and pace" including limiting a claimant's abilities to "simple, routine tasks that do not require constant interactions with coworkers or the general public" may be insufficient to address a claimant's capacity. *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009). Recha seizes on this language and argues that the ALJ, by using such boilerplate language here, committed reversible error.

The problem for Recha is that our case law has clarified that an ALJ has some latitude with the exact wording of an RFC as long as it conveys in some way the restrictions necessary to address a claimant's limitations. While we require "that the ALJ must account for the 'totality of a claimant's limitations' in determining the proper RFC," we have "decline[d] to provide a glossary of adjectives for use in RFC determinations." *Martin*, 950 F.3d at 374 (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) as amended on reh'g (Apr. 13, 2018)). Put another way, we have never required an ALJ to use the "specific terminology" of CPP in all cases and "have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Moreno*, 882 F.3d at 730 (internal citations omitted).

We assess whether an ALJ's decision adequately accounts for an applicant's limitations against the evidence in the record before the ALJ. The medical records submitted by Recha are replete with references to his self-reported hallucinations. But no medical opinion recommends limitations beyond those included in the RFC set by the ALJ. For example, Dr. Fitzpatrick noted that Recha was "able to maintain attention for two hours at a time and persist at simple tasks over eight- and forty-hour periods with normal supervision" but that his "symptoms would preclude persistence at more complex tasks over time." Agency psychiatrist Dr. Susan Donahoo recommended

similar limitations. These observations contradict the more restrictive CPP limitations that Recha contends the ALJ should have included in the RFC determination.

Even more, the agency psychiatrist, Dr. Reed, noted that during her examination Recha "reported [the] ability to spend 1 hour on his models at a time without a break," and concluded that Recha had only mild CPP limitations. Dr. Reed, too, did not suggest any additional limitations on Recha's functional capacity beyond those determined by the ALJ. These medical opinions adequately support the ALJ's decision.

Recha also challenges the weight the ALJ gave to the opinions of Dr. Fitzpatrick and Dr. Reed. He contends that Dr. Fitzpatrick's opinion from November 2015 was outdated by the time the ALJ issued his opinion because the subsequent two years of treatment notes from Mr. Ahrens and Dr. Barber showed that his symptoms and medications continued to change. Recha also argues that the ALJ improperly gave significant weight to Dr. Reed's opinion even though her accompanying report stated that she only reviewed 29 pages of medical records. Recha explained that he had submitted records totaling 697 pages.

The difficulty for Recha, however, is that an ALJ does not commit an error when "there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). And here Recha has not provided any other credible medical evidence indicating that his symptoms required additional RFC restrictions to account for CPP limitations beyond those included in the ALJ's decision.

We recognize that Recha submitted a medical opinion letter from his treating psychologist, Ahrens, that noted "marked restrictions in [Recha's] activities of daily living, difficulties with social functioning, difficulties maintaining concentration and repeated episodes of decompensation." But this letter did not suggest any specific work-related restrictions. Additionally, the ALJ was correct to afford little weight to this evidence because many of the statements included in the letter—including references to Recha's "illogical thinking" and "difficulties maintaining concentration"—were contradicted by Ahrens's own treatment notes which almost universally indicated that Recha's thinking was logical and coherent and reflected intact concentration. Dr. Barber recorded these same observations.

In the absence of any credible medical opinion or testimony to the contrary, the ALJ did not err in relying on the opinions of agency physicians which did not recommend any additional limitations beyond those the ALJ included in his RFC

determination. Though we do not doubt Recha suffers from serious mental health challenges, the ultimate disposition of his appeal is tied to the record before the ALJ. Based on that record, we cannot say the ALJ's decision limiting Recha to simple, routine, repetitive work with only simple changes in his daily work routine was not supported by substantial evidence.

For these reasons, we AFFIRM.